# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

AFRICARD CO. LTD.,

　　　　　　　*Petitioner*,

　　　　　　　v.

REPUBLIC OF NIGER,

　　　　　　　*Respondent*.

---

Civil Action No: 1:16-cv-196(ABJ)

---

## AFRICARD'S OPPOSITION TO NIGER'S MOTION TO VACATE A DEFAULT JUDGMENT AND DISMISS A PETITION TO CONFIRM A FOREIGN ARBITRAL AWARD AND EMERGENCY MOTION TO STAY ENFORCEMENT AND <u>EXECUTION OF DEFAULT JUDGMENT, AND AFRICARD'S MOTION TO STRIKE</u>

Christopher D. Man
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, DC  22306
(202) 942-6479 (telephone)

Thomas J. McCormack
John P. Figura
Jacob Laksin
CHADBOURNE & PARKE LLP
1301 Avenue of the Americas
New York, NY 10019-6022
(212) 408-5100 (telephone)

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................................................3

    A.    The Default Judgment Litigation Before this Court ..................................3

    B.    Proceedings for Execution of Judgment in the Southern District of New York......3

    C.    Niger's Purported Investigation of Fraud and Litigation of Its Fraud Allegations ........................................................................................5

ARGUMENT ..................................................................................8

I.    NIGER'S MOTION TO VACATE THE DEFAULT JUDGMENT SHOULD BE DENIED..................................................................................8

    A.    Niger's Purported Evidence Does Not Come Close to the Standard for Clear and Convincing Evidence under Rule 60(b)(3) ..................................9

    B.    Niger Relies Not on "New Evidence" under Rule 60(b)(2) but on Accusations It First Made Six Months Ago ..................................................13

    C.    Niger Provides No Other Reason that Might Justify Relief under Rule 60(b)(6) ..................................................................................15

    D.    Niger's Purported "New Evidence" of Fraud Is Inadmissible and Should Not Be Considered by the Court ..................................................16

    E.    This Court Has No Jurisdiction to Review the Finding or Order of Another U.S. District Court ..................................................................18

    F.    It Would Be Inequitable to Reward Niger's Tactic of Defaulting by Granting Its Requested Rule 60(b) Relief ..................................................19

II.    NIGER'S EMERGENCY MOTION FOR A STAY IS MERITLESS AND SHOULD BE DENIED..................................................................................21

    A.    Niger Has Shown No Likelihood of Success on the Merits under Rule 60...........22

    B.    Niger Faces No Risk of Irreparable Harm ..............................................22

    C.    Public Policy Favors Denial of a Stay ..................................................23

III.    THE ILLO DECLARATION AND ITS EXHIBITS SHOULD BE STRUCK FROM THE RECORD..................................................................................24

IV.    ANY ORDER FOR A STAY SHOULD ALSO REQUIRE THAT NIGER POST A BOND AS SECURITY TO AFRICARD ..................................................25

CONCLUSION..................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackermann v. United States*,
    340 U.S. 193 (1950).............................................................................................19

*Anwar v. Fairfield Greenwich Ltd.*,
    315 F.R.D. 638 (S.D.N.Y. 2016) ......................................................................14

*Baker v. Socialist People's Libyan Arab Jamahirya*,
    810 F. Supp. 2d 90 (D.D.C. 2011) ......................................................21, 22, 23, 24

*Dawe v. Corrections USA*,
    2010 WL 682321 (E.D. Cal. Feb. 24, 2010)..................................................16, 17

*Fosdick v. Schall*,
    99 U.S. 235 (1878)..............................................................................................20

*Gates v. Syrian Arab Republic*,
    646 F.3d 1 (D.C. Cir. 2011) .................................................................................8

*Gold Reserve Inc. v. Boliviang Republic of Venezuela*,
    146 F. Supp. 3d 112 (D.D.C. 2015) ...................................................................13

*Gonzales v. Natl. Westminster Bank, Plc*,
    2013 WL 6978874 (S.D.N.Y. Nov. 18, 2013)..........................................13, 14, 15

*Good Luck Nursing Home, Inc. v. Harris*,
    636 F.2d 572 (D.C. Cir. 1980) ...........................................................................19

*Gould Entm't Corp. v. Bodo*,
    107 F.R.D. 308 (S.D.N.Y.1985) ........................................................................15

*GSS Group Ltd. v. Nat'l Port Auth.*,
    2011 WL 13121428 (D.D.C. Aug. 8, 2011) .......................................................13

*Hinkson v. Bank of Am.*,
    2012 WL 12878684 (S.D. Cal. Nov. 13, 2012) ..................................................25

*Hollander v. Am. Cyanamid Co.*,
    172 F.3d 192 (2d Cir. 1999)...............................................................................24

*In re Hope 7 Monroe Street Ltd. P'ship.*,
    743 F.3d 867 (D.C. Cir. 2014) ..................................................................8, 9, 16

ii

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
   1994 WL 18588 (D.D.C. Jan. 10, 1994) .................................................................25

*Klayman v. Kollar-Kotelly*,
   2013 WL 2395909 (D.C. Cir. May 20, 2013) ..........................................................18

*Kotlicky v. U.S. Fidelity & Guar. Co.*,
   817 F.2d 6 (2d Cir. 1987) .....................................................................................8, 9

*Limon v. Double Eagle Marine, L.L.C.*,
   771 F. Supp. 2d 672 (S.D. Tex. 2011) ....................................................................15

*Martinez v. U.S. Postal Serv.*,
   2016 WL 225011 (D.C. Cir. Jan. 5, 2016) ..............................................................15

*Motorola Credit Corp. v. Uzan*,
   561 F.3d 123 (2d Cir. 2009) .....................................................................................8

*Mugno v. Societe Internationale De Telecommunications Aeronautiques, Ltd.*,
   2007 WL 316573 (E.D.N.Y. Jan. 30, 2007) ...........................................................25

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ................................................................................................18

*Salazar ex rel. Salazar v. District of Columbia*,
   633 F.3d 1110 (D.C. Cir. 2011) ................................................................................8

*Satterlee v. Commissioner of Internal Rev.*,
   2016 WL 7407330 (D.D.C. Sept. 2, 2016) .........................................................8, 15

*Shays v. Fed. Election Comm'n*,
   340 F. Supp. 2d 39 (D.D.C. 2004) ....................................................................21, 22

*Shepherd v. ABC, Inc.*,
   62 F.3d 1469 (D.C. Cir. 1995) ..................................................................................8

*Smalls v. United States*,
   471 F.3d 186 (D.C. Cir. 2006) ...........................................................................8, 19

*United States v. 8 Gilcrease Lane*,
   638 F.3d 297 (D.C. Cir. 2011) ................................................................................19

*United States v. Int'l Bhd. Of Teamsters*,
   247 F.3d 370 (2d Cir. 2001) ...............................................................................8, 23

*United States v. Judd*,
   42 F. App'x. 140 (10th Cir. 2002) ...........................................................................13

*United States v. Melot*,
   2012 WL 2914224 (D.N.M. May 23, 2012) ...........................................................................26

*United States v. Pappathansi*,
   383 F. Supp. 2d 289 (D. Mass. 2005) ...................................................................................11

*United States v. Philip Morris USA, Inc.*,
   840 F.3d 844 (D.C. Cir. 2016) ..............................................................................................15

*United States v. Tailwind Sports Corp.*,
   191 F. Supp. 3d 40 (D.D.C. 2016) ........................................................................................16

*Wisconsin Gas Co. v. F.E.R.C.*,
   758 F.2d 669 (D.C. Cir. 1985) ..............................................................................................22

**Statutes**

Foreign Sovereign Immunities Act ...........................................................................................4, 18

**Other Authorities**

Fed. R. Civ. P. 59 .............................................................................................................................9

Fed. R. Civ. P. 60 ..................................................................................................................... *passim*

Fed  R. Civ. P. 62 ..................................................................................................................... *passim*

Fed  R. Civ. P. 69 .............................................................................................................................4

Fed. R. Evid. 602 ................................................................................................................16, 17, 25

Fed. R. Evid. 901 ................................................................................................................16, 17, 25

N.Y. C.P.L.R. 5236 ..........................................................................................................................4

N.Y. C.P.L.R. 308 ............................................................................................................................4

iv

Petitioner Africard Co. Ltd. ("Africard") submits this Opposition to the Emergency Motion of Respondent Republic of Niger ("Niger") to Vacate a Default Judgment and Dismiss a Petition to Confirm a Foreign Arbitral Award and its Emergency Motion to Stay Enforcement and Execution of the Default Judgment.  (DE 32-1.)

Africard's June 7, 2017, opposition to Niger's pending Emergency Motion addressed the discrete issue of whether Niger's Emergency Motion was properly before this Court or should instead be brought before the Southern District of New York.  (DE 37.)  Africard now presents its opposition to the substance of Niger's Motion and Emergency Motion, including Niger's motion for a stay, motion for vacatur, and motion to dismiss, and Africard presents its own motion to strike.

## PRELIMINARY STATEMENT

Niger has moved, as well as can be determined, for an order (1) vacating this Court's September 27, 2016 Order confirming a December 6, 2014 arbitration award; (2) dismissing Africard's February 4, 2016 petition to confirm the CCJA's arbitration award; and, in the alternative or interim, (3) staying the execution efforts of the United States Marshal for the Southern District of New York, whose office is set to sell at public auction on June 27, 2017 in New York City a New York mansion owned by Niger that it uses for commercial activity.

Niger's Motion and Emergency Motion should be denied in their entirety.  Niger ignored the proceedings that began before this Court in February 2016 despite repeatedly being served with notice of them and acknowledging its awareness of the litigation.  Even now, at the conference before the Court on June 6, 2017, Niger offered no colorable explanation for its conduct, except that it was a tactical decision not to appear.  By Niger's telling, Niger discovered the basis of its current application – an unsubstantiated allegation of fraudulent conduct by Africard – in December 2016.  But instead of bringing its application at that time, it delayed yet

1

again, choosing to wait almost six months before finally moving before this Court on June 5, 2017, on the eve of execution upon this Court's judgment.

Aside from these delays, Niger's Motion and Emergency Motion are substantively meritless. Despite having 6 months to thoroughly investigate its claims, Niger still is unable to develop a record based on authentic, admissible evidence that would credibly suggest that any fraud took place. The "evidence" that Niger relies upon to allege fraud consists of documents and hearsay statements allegedly provided by a known liar: a Nigerien lawyer who was disbarred for falsifying documents, and who was reinstated to the bar by the Nigerien government as an apparent reward for providing testimony and "evidence" helpful to Niger and damaging to Africard. Even on its face, Niger's purported evidence is incredible, telling an absurd tale of an investigation whose alleged acts and timeline cannot be believed. And instead of supporting its application with factual testimony and authenticated, admissible documents, Niger relies on an attorney's declaration full of mere argument and a collection of exhibits that lack any evidence that they are what they purport to be. Instead of being treated as evidence, the declaration and its exhibits should be stricken from the record.

In sum, Niger's Motion for vacatur fails because Niger lacks "new evidence" under Rule 60(b)(2) of the Federal Rules of Civil Procedure, fails to provide any evidence, let alone clear and convincing evidence of fraud under Rule 60(b)(3), and points to no "other reason that justifies relief" under Rule 60(b)(6). Because Niger's Motion for vacatur is baseless and cannot succeed, Niger's Emergency Motion for a stay – which is unsupported by any show of irreparable harm to Niger and is against public policy – should also be denied. The Court should deny Niger's application in its entirety.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Default Judgment Litigation Before this Court

On February 4, 2016, Africard petitioned this Court to confirm an arbitration award issued December 6, 2014 by the Common Court of Justice and Arbitration ("CCJA") of the Organization for the Harmonization of Business Law, located in Abidjan, Côte d'Ivoire.  (DE 1.) When Niger failed to answer, the Clerk of Court issued a default judgment against it.  (DE 25 at 2.)  Africard served Niger with a copy of the default judgment, but again Niger did not respond. (*Id.* at 7, 9.)

On April 4 and 8, 2016, counsel for Africard received emails purportedly from an attorney for Niger, and on April 8, 2016, counsel for Africard received a telephone call from Peter Dee, an attorney at Mavronicolas & Dee LLP, counsel for Niger in the current motion. (*Id.*) at 8.  Mr. Dee informed counsel for Africard on April 11, 2016 that he did not represent Niger in this action but may be retained in the future, and he requested that Africard not pursue a default judgment against Niger.  (*Id.*)  Counsel for Africard declined, and Africard moved for default judgment on May 13, 2016.  (*Id.* at 2, 8.)  The Court granted Africard's motion for default judgment in a 15-page memorandum of opinion issued September 27, 2016, more than 7 months after Africard's petition was filed.  (*See generally id.*)  The Clerk of Court served a copy of the Court's Order of judgment upon Niger by mail on September 30, 2016.  (DE 28.)

Niger did not appear before this Court at any point during the proceedings in 2016.  (DE 25 at 9.)

### B.    Proceedings for Execution of Judgment in the Southern District of New York

Africard registered this Court's judgment before the United States District Court for the Southern District of New York ("SDNY Court") on October 18, 2016.  (Decl. of John P. Figura ("Figura Decl."), Ex. 2, at 2 (Civil Docket Report).)  The action was placed on the SDNY

3

Court's Part 1 docket, a docket for civil emergency matters, with a rotating assignment of district judges.

On January 6, 2017, Africard filed an Order to Show Cause for a temporary restraining order, preliminary injunction, and order providing for attachment of a multi-story mansion at 5 East 80th Street, New York, New York (the "Property"), which Africard learned was owned by Niger.  (Figura Decl. Ex. 4 at 1 (Memorandum in Support of Order to Show Cause); DE 22 at 1.)  Africard produced evidence showing that the Property was rented out by Niger to a private tenant, and not for any diplomatic or other government purpose.  Niger rented out the Property to Aby Rosen, a wealthy New York real estate developer, through an entity owned by Rosen called 5 E. 80th St. LLC.  (Ex. 4 at 11-13.)

Africard served the Order to Show Cause on four representatives of Niger's government on January 9, 10, and 11, 2017.  (Figura Decl. Ex. 2 at 3-4.)  The SDNY Court held a hearing concerning the Order to Show Cause on January 17, 2017.  (*See id.* at 5.)  Africard did not appear at the hearing or otherwise respond to the Order to Show Cause, and on January 17, 2017, Judge Robert A. Kaplan of the SDNY Court issued an Order providing that this Court's judgment of September 27, 2016 could be executed upon the Property.  (DE 32-24 at 3, 4 (Order of Judge Kaplan).)  The court found, *inter alia*, that:

> [T]he Property is not immune from attachment under the FSIA [Foreign Sovereign Immunities Act] because Niger uses the Property for commercial activity, and Niger has waived immunity from attachment under the PSA [Partial Settlement Agreement] and/or attachment and execution on the Property would satisfy an arbitral award in favor of Africard against Niger in whole or in part.

(*Id.* at 2.)

On April 10, 2017, on Africard's motion, the SDNY Court issued an Order providing for substitute service upon Niger of a Notice of Sale of the Property pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and New York Civil Practice Law and Rules Sections 308(5)

and 5236(c).  Figura Decl. Ex. 2 at 6.  On April 24, 2017, the U.S. Marshal issued a Notice of Sale announcing that the Property would be sold at a public auction conducted by the U.S. Marshal on June 27, 2017, (Figura Decl., Ex. 3.) and on May 1 the U.S. Marshal served copies of the Notice of Sale on Niger by mail.  (Figura Decl. Ex. 2 at 6.)[1]

Niger did not appear before the SDNY Court at any point during these proceedings and did not appeal any order issued therein to the United States Court of Appeals for the Second Circuit.

### C.   Niger's Purported Investigation of Fraud and Litigation of Its Fraud Allegations

Niger claims that in December 2016, it discovered evidence that Africard's arbitration award from the CCJA was obtained through fraud.  According to documents produced by Niger with its filing, Niger purportedly launched an investigation of this alleged fraud on December 27, 2016, following a request that had been made that same day by the President of Niger to investigate "questionable practices" concerning the arbitration.  (DE 32-5, 32-6.) That day, prosecutors in Niger allegedly demanded that Niger's state-owned telephone company, Niger-Telecom S.A. ("Niger Telecom"), produce four years of emails between Africard's Chief Executive Officer, Dany Chaccour ("Chaccour"), and a lawyer who had represented Africard in the arbitration proceeding, Souleymane Yankori ("Yankori").  (DE 32-6.)

---

[1]     At the conference before this Court on June 6, 2017, counsel for Niger provided the following account of Africard's dealings with the U.S. Marshals Service:  "They struggled with the state marshal for a while to get them to do it, apparently, because we did some research on that.  And then finally, when he said I can't do this, they finally went to the federal marshal to get it done."  (6/6/17 Tr. at 12.)  This account is not accurate.  Africard was advised by the Sheriff of New York County that the Office of the Sheriff could execute the auction, but Africard chose to work with the U.S. Marshal instead.  (Figura Decl. at ¶ 9.)

Within two days, on December 29, 2016, Niger-Telecom had somehow reviewed four years of emails between Chaccour and Yankori and determined that it would produce to Nigerien prosecutors only two emails they had exchanged, dated June 1 and 2, 2014, respectively.  (DE 32-7 at 2.)  That same day, December 29, Niger's Attorney General purportedly issued a report in which he announced "[t]he results of the investigations" and concluded that there were "serious and corroborating indications of corrupt practices in connection with the arbitration." (*Id*.)

Still on December 30, attorneys for Niger managed to draft an 11-page legal memorandum applying to the CCJA for a *revision*, or review, of the CCJA's arbitration award. (Kaspereit Decl. Ex. 3.)[2]  On January 10, Niger filed two additional applications alleging fraud in connection with the arbitration:  one with an arbitration tribunal of the International Chamber of Commerce, located in Abidjan, Côte d'Ivoire, and the other with the High Court of Nanterre, France.  (DE 37-2 at 6.)  Niger's current application to this Court, filed June 5, 2017, is the fourth application Niger has filed with a tribunal during the past six months alleging fraudulent conduct by Africard in connection with the CCJA arbitration.  None of these tribunals has found that Niger's argument meritorious or its evidence convincing.  (Kaspereit Decl. ¶ 4.)  Those actions remain pending.  (*Id*.)

During the conference before this Court on June 6, 2017, Counsel for Niger represented that the proceedings in France have been stayed.  Counsel stated, "There are proceedings pending in France . . . .  There has been a stay, a prevention of execution on assets way over the amount of what we have here since July of last year. . . .  But for the moment there has been a stay or a failure for the courts to go forward to execute in France since 2016."  (6/6/17 Tr. at 17.)

---

[2]    Niger previously filed an appeal of the CCJA decision with the CCJA, but that tribunal dismissed Niger's appeal on July 14, 2016.  (DE No. 37-2, at 2 (Judgment of High Court of Nanterre, France, dated March 14, 2017).)

Niger's counsel misspoke; as testified to by Africard's counsel in France, there has been no stay

of such garnishment proceedings in that country.  (Kaspereit Decl. ¶ 3.)  Niger petitioned the

High Court for just such a stay – substantially the same relief Niger seeks here, and based on the

same allegations of fraud – but that court denied Niger's application on March 14, 2017,

concluding,

> [N]o element of this case file, notably the sole relaying of photocopies of the letters, allows one to affirm that these letters are originals and that they were in fact drafted by Mr. Souleymane YANKORI and M. Dany CHAKOUR.
>
> FURTHERMORE, the content of the letters is neither clear nor explicit enough to confirm the existence of fraud committed by AFRICARD and the expert, Mr. WABI.
>
> Finally, it is difficult to support the fact that, per these exchanges of June 2014, that Mr. DICKO and the arbiter who handed down the award had participated in corruption as alleged by the Republic of NIGER .
>
> Also, the Republic of NIGER did not add to the case file materials to sufficiently prove the need of obtaining judicial review, being noted that all appeals logged by the latter since the award, have not resulted in a decision in their favor.
>
> Therefore, in the absence of evidence proving their arguments, the Republic of NIGER does not meet the conditions provided for under Article 599 of the Civil Procedure Code necessary for the issuing a stay of proceedings.
>
> . . .
>
> Thus, the Republic of NIGER requests to this end are dismissed.

(DE 37-2 at 7.)

On June 5, 2017 – five months after Niger raised its allegations of fraud in its petitions to

the CCJA, the International Chamber of Commerce, and the High Court of Nanterre – Niger

filed before this Court its Motion to vacate this Court's default judgment, dismiss Niger's

petition to confirm the CCJA's arbitral award and its Emergency Motion for a stay of

enforcement and execution of the default judgment.  (DE 32-1.)

**ARGUMENT**

**I.     NIGER'S MOTION TO VACATE THE DEFAULT JUDGMENT SHOULD BE DENIED**

This Court should deny Niger's motion for vacatur under Rule 60(b) of the Federal Rules of Civil Procedure.  "A motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances."  *United States v. Int'l Bhd. Of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001).  "[T]he relief available under Rule 60(b) is both discretionary and equitable."  *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 125 (2d Cir. 2009); *see Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1115-16 (D.C. Cir. 2011) (explaining that "Rule 60(b) does not create a new remedy at all," it "reflects the equitable principles that embodied prior practice").  "Generally, courts require that the evidence in support of the motion to vacate a final judgment be 'highly convincing,' that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties."  *Kotlicky v. U.S. Fidelity & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987) (citation omitted).

Here, Niger, as "the party seeking to invoke [Rule 60(b)] bears the burden of establishing that its prerequisites are satisfied."  *Gates v. Syrian Arab Republic*, 646 F.3d 1, 5 (D.C. Cir. 2011) (citation omitted) (alteration in original).  And because Niger seeks Rule 60(b) relief based on claims of fraud and misconduct, it must prove its case "by clear and convincing evidence."  *In re Hope 7 Monroe Street Ltd. P'ship.*, 743 F.3d 867, 875 (D.C. Cir. 2014); *see Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995).  These are high standards, and as this Court recognizes,"[a] district court enjoys significant discretion in deciding whether to grant or deny a Rule 60(b) motion."  *Satterlee v. Commissioner of Internal Rev.*, 2016 WL 7407330, at *1 (D.D.C. Sept. 2, 2016) (Jackson, J.) (quoting *Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996)); *see Smalls v. United States*, 471 F.3d 186, 191

(D.C. Cir. 2006) ("Our review is limited to determining whether the district court abused its discretion.").

Niger cannot carry its evidentiary burden and is not entitled to equitable relief.   Rule 60(b) of the Federal Rules of Civil Procedure, "Grounds for Relief from a Final Judgment, Order, or Proceeding," states that a "court may relieve a party . . . from a final judgment" for, *inter alia*, "(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; "(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party"; or "(6) any other reason that justifies relief."  Niger relies on each of these bases.  It fails, however, to satisfy the requirements of any of them.

### A.   Niger's Purported Evidence Does Not Come Close to the Standard for Clear and Convincing Evidence under Rule 60(b)(3)

It is well-settled that a party seeking relief from a judgment under Rule 60(b)(3) must present "clear and convincing" evidence that the relief is warranted.  *See In re Hope 7 Monroe St. Ltd. P'ship*, 743 F.3d at 875 ("A litigant seeking relief under Rule 60(b)(3) must prove the fraud, misrepresentation, or misconduct by clear and convincing evidence.").   The fact documents Niger relies on to support its case (which are inadmissible as evidence, as addressed below) fail to provide "highly credible" evidence that Africard's CCJA award was the product of any sort of fraud, *Kotlicky*, 817 F.2d at 9 – and they certainly do not constitute "clear and convincing" evidence of fraud, *In re Hope 7 Monroe St.*, 743 F.3d at 875.

Yankori, the Nigerien lawyer on whose supposed documents Niger relies, is not a credible witness; he has a history of falsifying documents and a strong  reason to concoct lies that benefit Niger.  On October 26, 2015, Yankori was disbarred from the practice of law in Niger.  (Kaspereit Decl., Ex. 1, at 9-10.)  Among the primary reasons:  falsification of documents

in connection with litigation.  (*See id.* at 9.)  In a decision affirming the appeal of his disbarment, the Court of Appeals of Niamey, Niger, stated as follows:

> [F]ollowing the request from the Foreign Bank to justify to the expenses of [an] amount, Souleymane Yankori Esq. provided a copy of a check, signed by him to the order of the court clerk of the High Court of Agadez as justification of the . . . expense and also attached to it a falsified receipt issued to Agadez by the same clerk, and dated it the same as the checked signed to Niamey; that these various documents were found to be fake, upon a verification done in Agadez with the Atlantic Bank and the High Court . . . .

(*Id.*)  Based in part on this falsification of documents, Yankori was disbarred.  *Id.* at 9-10.  This fact alone casts deep suspicion on any document that is now purportedly produced or vouched for by Yankori, such that it cannot be considered "highly credible" or "clear and convincing" evidence.

If Yankori falsified documents here, he certainly had a strong motivation for doing so. On October 11, 2016 – two weeks after this Court issued its September 27, 2016 Order granting Africard's motion for default judgment against Niger – the Legal Department of Niger's Council of State stayed the decision of the Court of Appeals, allowing Yankori to be reinstated to the practice of law in the country.  (Kaspareit Decl. Ex. 2 at 4.)  Yankori's lawyer was none other than Issoufou Illo – the same lawyer who is now representing Niger in the current proceeding, and whose name appears on the Illo Declaration on which Niger relies.  (*Id.* at 1; DE 32-2.)  In reinstating Yankori, the Council of State did not state that the previous factual findings concerning Yankori's falsification of documents was incorrect.  (*See id.* at 3-4.)  The suspicious timing of the reinstatement decision and Yankori's representation by Issoufou are likely not mere coincidence; they strongly suggest that Niger reinstated Yankori to the bar in return for Yankori's agreement to provide Niger with favorable testimony, in hopes of eventually prevailing over execution of this Court's decision.  Any purported assertions by Yankori or

documents produced by him – which are all that Niger's allegations of fraud rest upon – are thus highly suspect.

Moreover, Yankori depends on the good graces of Niger for more than just keeping his law license, he must cooperate for his freedom.  As Niger's own motion reveals, Yankori was indicted by the prosecutor in Niger on March 22, 2017 for corruption concerning the scheme it alleges here.  (DE 32-1 at 10.)  Yet Yankori apparently is cooperating with the prosecutors (and apparently has not been arrested), by among other things providing favorable testimony to the prosecution a month following his indictment.  (*Id.*)  As a cooperating witness, this Court has every reason to greet his testimony with suspicion.  *See, e.g.*, *United States v. Pappathansi*, 383 F. Supp. 2d 289, 299 (D. Mass. 2005) ("As the court regularly instructs juries, statements of cooperating witnesses must always be scrutinized carefully because of their incentive to lie and blame others.") (citing pattern jury instructions).  And given Yankori's apparent history of forging documents for financial gain, there is little reason to question whether he would do the same for his freedom.  His testimony cannot supply "highly convincing" or "clear and convincing" evidence of anything.

In addition, Niger puts forth a story of its so-called investigation of fraud that can only be described as absurd.  In Niger's incredible version of events, the bulk of the investigation occurred during a remarkable three-day flurry of activity on December 27, 2016 and the following two days, during which all of the following happened:

- On December 27, 2016, the President of Niger informed Niger's Minister of Justice that Niger "obtained information" that the arbitration was obtained through "questionable practices" that could be verified by checking messages between Africard and its lawyers.  (DE 32-5.)

- The same day, December 27, the Minister of Justice sent Niger's Attorney General a Letter of Complaint concerning the matter.  (*See* DE 32-7 at 2.)

11

- Still the same day, the Attorney General at the Court of Appeal of Niamey sent Niger-Telecom S.A. a request for "the incoming and outgoing emails" between Yankori and Chaccour, Africard's CEO, over a four-year period from 2013 until December 2017.  (DE 32-6.)

- Again the same day, the General Prosecutor's Office at the Niamey Court of Appeal sent Niger-Telecom an "Expert Requisition" demanding production of the same emails over a four-year period.  (DE 32-7 at 3.)

- On December 29, Niger-Telecom provided the Public Prosecutor General of the Court of Appeal with copies of emails between Yankori and Chaccour only from the dates of June 1 and 2, 2014.  (DE 32-7 at 5.)

- The same day, December 29, the Attorney General sent the Minister of Justice a letter stating that there were indications of "corrupt practices" concerning the arbitration.  (DE 32-7 at 3.)

- On December 30, 2016, Niger drafted a legal memorandum in support of an application with the CCJA for review of the CCJA's initial arbitration executed by Illo, from Niger, and two attorneys from Benin and France.  (Kaspereit Decl. Ex. 3 at 2.)

Nowhere does Niger explain (1) how this whirlwind of decision-making, document access, analysis, and legal writing was orchestrated among multiple Nigerien government agencies, government-owned telecommunications company, and lawyers from three separate countries within a 72-hour period; (2) why Niger's investigation began with the president of the country, who has no apparent connection to the facts of this case; (3) how a government-owned telecommunications company, Niger-Telecom gained access to emails sent via a private Google Gmail account; (4) how Niger-Telecom searched a *four-year* trove of emails within a mere 48 hours; or (5) how in such a short time Niger-Telecom produced not hundreds of emails between a lawyer and his client but instead only the two emails from June 1 and 2, 2014.  In short, Niger's account of the investigation defies belief.  More likely, the investigation is a sham. There is no evidence indicating that the evidence this sham investigation uncovered are authentic or admissible under the Federal Rules of Evidence, as discussed below.

12

After reviewing Niger's evidence, the court in Nanterre in Paris, France, denied Niger's motion for a stay in view of "the absence of evidence proving their arguments."  (DE 37-2 at 7.)  The same reasoning applies here.  In view of the unreliability of Yankori and the documents he purportedly provided, the implausibility of Niger's account of its investigation, the questionable nature of the documents discovered, and the lack of anything remotely close to "clear and convincing evidence" of fraud, Niger's motion to vacate under Rule 60(b)(2) and 60(b)(3) should be denied.

**B.    Niger Relies Not on "New Evidence" under Rule 60(b)(2) but on Accusations It First Made Six Months Ago**

Niger argues that it is entitled to vacatur under Rule 60(b)(2) based on "new evidence" that it recently discovered.[3]  But this so-called evidence is hardly new.  By Niger's own account, it was purportedly discovered *almost six months ago*.  (DE 32-1 at 17 ("Niger discovered the new evidence in December 2016").)

A Rule 60(b)(2) motion must be made within a "reasonable time" after new evidence is discovered and no more than a year after the entry of the judgment.  Fed. R. Civ. P. 60(c)(1).  The one-year period "represents an extreme limit, and the motion may be rejected as untimely if not made within a reasonable time even though the one-year period has not expired."  *Gonzales*

---

[3]    In a footnote, Niger also dumps undeveloped claims that Africard's alleged conduct warrants relief from the default judgment under Rules 60(b)(1) and 60(b)(4).  (DE 32-1 at 18 n. 5.)  But "[a]rguments made in a perfunctory manner, such as in a footnote, are waived." *United States v. Judd*, 42 F. App'x. 140, 144 (10th Cir. 2002); *see Gold Reserve Inc. v. Bolivian Republic of Venezuela*, 146 F. Supp. 3d 112, 126-27 (D.D.C. 2015 (Boasberg, J.) (finding Venezuela waived argument made only in a "brief footnote").  As Judge Friedman noted in finding waiver for an argument raised solely in a footnote, "[j]udges 'are not like pigs, hunting for truffles buried in the briefs' or the record."  *GSS Group Ltd. v. Nat'l Port Auth.*, 2011 WL 13121428, at *5 (D.D.C. Aug. 8, 2011) (quoting *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring)) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

*v. Natl. Westminster Bank, Plc*, 2013 WL 6978874, at *5 (S.D.N.Y. Nov. 18, 2013) (quoting 11 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2866 (3d ed. 2013)). Where the movant fails to articulate some "reasonable basis" for the delay, *see Anwar v. Fairfield Greenwich Ltd.*, 315 F.R.D. 638, 640 (S.D.N.Y. 2016), "courts have held that delays of as little as five months are unreasonable and, in turn, denied the subject Rule 60(b) motion as untimely." *Gonzales*, 2013 WL 6978874, at *5.

In arguing that Niger possessed "new evidence," counsel for Niger represented to the Court during the conference that "in December [2016] Niger just learned that there was a possibility of a fraud," (6/6/17 Tr. 17); that Niger launched a "criminal proceeding" that "began in January," (*id*. at 9), and is "ongoing"; that "most of that material [evidence of fraud] that started to really gel came in April of this year and May." (*id.* at 18:1-3).

But Niger's own documents indicate that all those representations by Niger are  false. According to Niger's "evidence," the Attorney General of Niger learned in December 2016 that there was far more than a "possibility of fraud."   In his alleged words, "The Results of the investigations have just reached us; these show serious and corroborating indications of corrupt practices in connection with the arbitration relating to the State of Niger and Africard."  (DE 32-7 at 2.)  Niger's General Prosecutor's Office purportedly initiated a criminal proceeding that same month – December 2016 – not in January 2017.  (DE 32-7 at 3.)  And far from seeing evidence that only "started to really gel . . . in April of this year and May," Niger's case appears to rest on the alleged June 1 and 2, 2014 emails and Yankori's January 31, 2017 letter, which were allegedly obtained by Niger in December 2016 and March 2017, respectively.  (DE 32-2 ¶ 2; *see also id.* ¶¶ 2-6 (discussing same documents); DE 32-1 at 20-23 (same).)

In short, Niger was allegedly confident that there was fraud almost *six months ago*, based on the June 1 and 2, 2014 emails, a view that was merely bolstered by its discovery three months

ago of Yankori's alleged January 30 letter.  This delay renders Niger's motion untimely – even if its purported evidence were credible.  *See Gonzales*, 2013 WL 6978874, at *6 (Rule 60(b)(2) motion untimely where movant waited six months after discovery of new evidence to file); *Gould Entm't Corp. v. Bodo*, 107 F.R.D. 308, 311 (S.D.N.Y.1985) (five-month delay untimely); *Limon v. Double Eagle Marine, L.L.C.*, 771 F. Supp. 2d 672, 677–79 (S.D. Tex. 2011) (four-month delay untimely).  Because Niger's argument does not actually rest on "new evidence", its motion for vacatur under Rule 60(b)(2) should be denied.

### C.    Niger Provides No Other Reason that Might Justify Relief under Rule 60(b)(6)

Niger fails to provide any other reason that justifies relief.  Niger devotes a paragraph to arguing that it is entitled to relief under Rule 60(b)(6) based on some "other reason that justifies relief," but this argument fares no better.  (DE 32-1 at 14.)  This Court has recognized that Rule 60(b)(6) "'is a catch-all, residual clause,'" which "'should be only sparingly used' in 'extraordinary circumstances.'"  *Satterlee*, 2016 WL 7407330, at *2 (first quoting *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1140 (D.C. Cir. 1988), and second quoting *Salazar ex rel. Salazar*, 633 F.3d at 1116, 1120); *see Martinez v. U.S. Postal Serv.*, 2016 WL 225011, at *1 (D.C. Cir. Jan. 5, 2016) ("Rule 60(b)(6) should be only sparingly used; subsection (6) requires a 'more compelling showing of inequity or hardship.'").  "Extraordinary circumstances is a high bar" and "Rule 60(b)(6) cannot be used 'to rescue a litigant from strategic choices that later turn out to be improvident,'" like Niger's strategic decision to default in this litigation.  *United States v. Philip Morris USA, Inc.*, 840 F.3d 844, 852 (D.C. Cir. 2016) (quoting *Kramer v. Gates*, 481 F.3d 788, 792 (D.C. Cir. 2007)).

Moreover, Niger simply repeats that the basis for its 60(b)(6) claim is the same as its claimed basis for seeking relief under Sections 60(b)(2) and (b)(3), claiming that the arbitration award was "procured by fraud and bribery," (DE 32-1 at 19) and the D.C. Circuit has squarely

held under nearly identical circumstances that it is not enough to seek Rule 60(b)(6) relief "premised on nothing more than the arguments supporting relief under Rule 60(b)(2) or (3)—the new evidence and alleged fraud." *In re Hope 7 Monroe Street*, 743 F.3d at 876.  Niger cannot "circumvent" the limitations of Sections (b)(1) through (b)(5) through Section (b)(6), and its claim fails here because it fails to raise any "independent grounds" for relief.  *Id.*

### D.   Niger's Purported "New Evidence" of Fraud Is Inadmissible and Should Not Be Considered by the Court

The Court should also disregard Niger's allegations because the purported "new evidence" of fraud that Niger's argument relies upon is inadmissible under the Federal Rules of Evidence.  A document is admissible as evidence only when the proponent "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Under Rule 901(b), the requirements of Rule 901(a) "can be satisfied by the testimony of a witness with knowledge 'that an item is what it is claimed to be.'"  *United States v. Tailwind Sports Corp.*, 191 F. Supp. 3d 40, 41 (D.D.C. 2016) (citing *Id.* 901(b)(1)).  For example, in *Dawe v. Corrections USA*, 2010 WL 682321 (E.D. Cal. Feb. 24, 2010), the court found that documents purportedly "'authenticated' [as evidence] by defendants' counsel" were inadmissible under Rule 901 "because defendant's counsel has failed to demonstrate any personal knowledge as to the authenticity of these documents."  *Id.* at *1.

Niger's entire case rests on purported "new evidence" that was allegedly provided by Yankori, the Nigerien attorney who previously represented Africard.  The documents from Yankori include emails purportedly sent between Yankori and Africard CEO Chaccour via Gmail on June 1 and June 2, 2014, alleged text messages, and a letter allegedly sent by Yankori to Chaccour on January 31, 2017.  (DE 32-9.)

16

The Yankori evidence is not supported by any affidavit by Yankori himself – who would be in a position to say that the documents are what they are claimed to be – but by one of Niger's attorneys, a man named Issoufou Illo, who Niger claims has "identified and authenticated" the documents provided.   (DE 32-1 at 16.)   But Illo has done no such thing.   Instead of demonstrating the authenticity of the documents, Illo simply makes factual allegations and cites them as support, as one might do in an argumentative memorandum.   (*See generally* DE 32-2.) He does not identify the documents, explain how he obtained them, or testify that they are true and accurate (or how he could know).   *Id.*   He certainly does not testify that he has any personal knowledge of the documents that would enable the Court to conclude that he is a "witness with knowledge" of them.  Fed. R. Evid. 901(b)(1).   The documents are unauthenticated and therefore inadmissible as evidence.  Fed. R. Evid. 901(a).

When Niger put forth its fraud allegations to the High Court in Nanterre, based on the same so-called evidence it relies on here, the court reached a similar conclusion:

> To support their position and to prove the existence of fraud, [Niger] provided emails dated June 1st and 2nd 2014 exchanged between Mr. Souleymane YANKORI and Mr. Dany CHAKOUR.
>
> . . .
>
> [N]o element of this case file, notably the sole relaying of photocopies of the letters, allows one to affirm that these letters are originals and that they were in fact drafted by Mr Souleymane YANKORI and M. Dany CHAKOUR.

(DE 37-2 at 6-7.)  Based on this and other factors, the French court held that it would "REJECT[] the stay of proceedings."  (*Id.* at 8.)  Here, too, Niger's purported "evidence" cannot be the basis for vacating the default judgment and staying the execution proceedings.

**E.     This Court Has No Jurisdiction to Review the Finding or Order of Another U.S. District Court**

Niger's motion for vacatur, whether under Rule 60(b)(2), (b)(3), or (b)(6), also fails because it rests in part on a frivolous challenge to findings that were made by Judge Robert Kaplan in the Southern District of New York.

In his Order of January 17, 2017, Judge Kaplan found that "[T]he Property [at 5 East 80th Street in New York City] is not immune from attachment under the FSIA [Foreign Sovereign Immunities Act] because Niger uses the Property for commercial activity, and Niger has waived immunity from attachment under the PSA [partial settlement agreement]."  (DE 32-24 at 2.) Niger now argues that Judge Kaplan erred because, in fact, "the NY Property is immune from execution since it is used for the diplomatic purpose of funding the Mission [of Niger to the United Nations]."  (DE 32-1 at 5.)  In other words, Niger is asking this Court to vacate the Order issued by Judge Kaplan because of judicial error.

As an initial matter, Niger's attempt at an appeal is meritless on the substance:  Judge Kaplan did not err, and Niger points to no legal authority suggesting that he did.[4]  But in any event, this Court simply has no jurisdiction to review a factual finding or order issued by another District Court of the United States.  *See*, *e.g.*, *Klayman v. Kollar-Kotelly*, 2013 WL 2395909, at

---

[4]      Contrary to Niger's argument, the FSIA's "commercial activity" exception to sovereign immunity does not turn on whether Niger had a diplomatic "purpose" in renting out the property to a Delaware company for use as a private residence.  "[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the government's particular actions (whatever the motive behind them) are the *type* of actions by which a private party engages in commerce." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) (emphasis in original)).  Judge Kaplan correctly found that Niger was engaged in commercial activity, and Niger provides no legal or other authority to suggest that he was wrong.  To the contrary, evidence submitted by Niger indicates that Niger has used the property to carry out commercial activity for at least 25 years.  (*See* Idrissa Tino, Aff., DE 32-19 ¶ 2 ("The Niger Townhouse remained the residence of the various Niger Ambassadors to the United Nations until 1992 when the property was closed because of an economic crisis in Niger that made it impossible to maintain the Niger Townhouse as the residence of Niger Ambassadors to the United Nations.").)

*1 (D.C. Cir. May 20, 2013).  Moreover, by failing to timely appeal Judge Kaplan's order, those findings became binding under *res judicata* principles.  (*See* DE 37 at 4-5.)

### F.   It Would Be Inequitable to Reward Niger's Tactic of Defaulting by Granting Its Requested Rule 60(b) Relief

The Court also should be mindful that "Rule 60(b) cannot . . . be employed simply to rescue a litigant from strategic choices that later turn out to be improvident."  *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980); *see Smalls*, 471 F.3d at 191. As the Supreme Court has emphasized:  "There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from."  *Ackermann v. United States*, 340 U.S. 193, 198 (1950).  And the D.C. Circuit has explained that "[t]his teaching has guided much of our Rule 60(b) case law."  *United States v. 8 Gilcrease Lane*, 638 F.3d 297, 301 (D.C. Cir. 2011).

Here, Niger defaulted and its counsel has made clear that was his "client's call."  (6/6/17 Tr. at 11 (Mavronicolas).)  He explained "you have to have a basis for resisting an arbitration award" and that Niger had "no basis" for resisting the award until now.  (*Id.* at 10.)  He elaborated that "it certainly would have made sense not to appear . . . quite simply because there was nothing they could do at that point," and he explained the tactical nature of that decision, because "just as a practical matter, a sovereign makes itself available for jurisdiction on a matter that it really doesn't have a defense for at that point – at that point – and makes yourself open for discovery and all the rest of it, and execution …."  (*Id.* at 11.)  In other words, by not appearing, Niger would not submit to the jurisdiction of this Court, where it could be subject to discovery of its assets so that Africard could execute upon them.  Niger hoped Africard would be unable to find assets of Niger to execute upon (or perhaps Niger hoped it could remove those assets from the reach of the Court).

19

Whatever the reason for Niger's decision, it is inequitable to allow Niger to benefit in this litigation by having failed to appear sooner. Had Niger simply answered the February 4, 2016 petition and admitted then that it had "no basis" for resisting the confirmation of the arbitral award, this Court would have promptly awarded judgment to Africard and the one-year limitation for re-opening a judgment under Rule 60(b) would have passed. Fed. R. Civ. P. 60(c)(1). Instead, Niger's tactical decision led the Court to hold the door open for Niger to appear for 7 months before entering a default judgment against Niger on September 27, 2016, which is the only reason Niger's Rule 60(b) motion falls within that one-year deadline.

In sum, Niger's inequitable conduct in this case is manifold: Niger's disregard for this action, which was first filed in this Court in February 2016; its failure to bring the current motion even after purportedly discovering a basis for it in December 2016; Niger's representations to the Court during the conference that were contradicted by Niger's own documents. As discussed above, Niger's reliance on documents from an unreliable witness and on a facially implausible story of a so-called investigation, and Niger's bringing of a motion based in part on the frivolous argument that this Court should review an alleged error made by another U.S. District Court. Under "the operation of a rule that always applies" in cases seeking equitable relief, you must "do equity to in order to get equity." *Fosdick v. Schall*, 99 U.S. 235, 253 (1878). Having chosen a deliberate strategy of default, Niger should be denied equitable relief under Rule 60(b).[5]

---

[5]     Africard previously suggested that the SDNY Court would be the better court to decide Niger's motion for an emergency stay pending this Court's resolution of Niger's Rule 60(b) motion to vacate. (DE 37.)  Given that Niger has failed to create a record that would justify its requested Rule 60(b) relief, this Court would be warranted in denying Niger's motion to vacate under Rule 60(b) and it could then deny the emergency stay motion as moot.

## II.   NIGER'S EMERGENCY MOTION FOR A STAY IS MERITLESS AND SHOULD BE DENIED

In the two pages that Niger devotes to its argument for a stay, Niger fails to acknowledge the well-established standard courts use to determine whether a stay is warranted under Rule 60. Applying that standard to the facts, Niger's argument for a stay collapses.

A stay of enforcement proceedings pending appeal of a default judgment "is an extraordinary remedy." *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 96 (D.D.C. 2011) (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)); *see also Shays v. Fed. Election Comm'n*, 340 F. Supp. 2d 39, 41 (D.D.C. 2004) (denying stay where movant failed to satisfy the "stringent standards required to justify the extraordinary remedy of a stay pending appeal").  Because a stay is "an intrusion into the ordinary process of . . . judicial review and accordingly is not a matter of right," *Baker*, 810 F. Supp. 2d at 96, Niger "bears the burden of justifying why the court should grant this extraordinary remedy." *Id.*

In deciding whether to issue a stay, courts consider four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id*. at 96-97.

Of the four factors, the first two – likelihood of success on the merits and the risk of irreparable harm – "are the most critical." *Id*. at 97.  Accordingly, "[t]he moving party must make a strong showing on at least one of these two factors and some showing on the other." *Id*. Niger cannot make the required showing on either of these factors, and as such is not entitled to the "extraordinary" relief it now seeks.

**A.    Niger Has Shown No Likelihood of Success on the Merits under Rule 60**

To demonstrate a likelihood of success on the merits, "the moving party must show more than a mere possibility of success on appeal." *Baker*, 810 F. Supp. 2d at 97.  Instead, the movant must "raise questions going to the merits so serious, substantial, difficult and doubtful as to require further deliberative investigation on them" by the court. *Shays v. FEC*, 340 F. Supp. 2d 39, 47 (D.D.C. 2004) (internal quotations omitted).  As discussed above, Niger does not come close to satisfying the "clear and convincing" standard required to vacate a default judgment under Rule 60(b)(3), nor has it presented "highly credible" admissible "new evidence" as required by Rule 60(b)(2).  Niger's application thus fails to raise any "serious, substantial, difficult and doubtful" questions concerning the merits of Africard's judgment, and accordingly its motion for a stay should be denied.

**B.    Niger Faces No Risk of Irreparable Harm**

Niger's argument for a stay also fails because Niger relies only on alleged economic injury and fails to demonstrate any irreparable harm that might occur absent a stay.  "It is well-settled that economic loss does not, in itself, constitute irreparable harm." *Baker*, 810 F. Supp. 2d at 97.  As the Court of Appeals for this Circuit has observed:

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original, citation omitted).  Moreover, "the failure to make any showing of irreparable harm is grounds for refusing to grant a stay, even if the other three factors merit relief." *Baker*, 810 F. Supp. 2d at 97.  Simply put, an "irreparable injury is one that cannot be addressed through a monetary award. [Thus,] where money damages are adequate compensation [injunctive relief] should not issue."

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 1993 WL 42759, at *2 (S.D.N.Y. Feb. 11, 1993) (alterations in original) (citing *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

Any injury claimed by Niger absent a stay would be far from irreparable.  The property at issue is commercial property, used by Niger for commercial purposes for decades.  Should it be sold at auction, as scheduled, "adequate compensatory or other corrective relief" would be available to Niger in the form of recovery of the property or the money obtained from the sale.  Any damage from an improper judicial sale is far from irreparable.  Niger's argument fails on this point.

### C.    Public Policy Favors Denial of a Stay

Because Niger can demonstrate neither a likelihood of success on the merits nor irreparable harm if the stay is not granted, "[t]he remaining factors, even if meritorious, would fail to sway the balance in the defendants' favor."  *Baker*, 810 F. Supp. 2d at 100.    But in addition, public policy also weighs against staying the sale.   In cases involving a "totally unresponsive party" such as Niger, a "default judgment is intended to protect the diligent party lest he be faced with interminable delay and continued uncertainty as to his rights."  *Baker*, 810 F. Supp. 2d at 95 (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980), and *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  "The default judgment further serves as a deterrent to parties who choose delay as part of their litigative strategy."  *Id*. (internal quotations omitted).

Niger's disregard for proceedings before this Court is impermissible under any concept of judicial policy.  As the Court stated, Niger bears "significant blame for the fact that this has become an emergency" (6/6/17 Tr. at 18), and "some responsibility for the fact that [it has] a judgment against [it]" (*id.* at 11: 2-4).  Niger has no reasonable explanation for its action.  During

23

the conference, Niger's counsel suggested that his client chose to ignore this lawsuit because doing so would mean that "a sovereign [Niger] makes itself available for jurisdiction on a matter that it really doesn't have a defense for at that point – at that point – and makes yourself [sic] open for discovery and all the rest of it, and execution" – a rationale with no apparent legal justification – before ultimately conceding, "[T]his isn't my call, this is the client's call; they've done their own decision in terms of what they would do." (6/6/17 Tr. at 11.) Even after allegedly discovering a basis for its current motion, in December 2016 – when Niger purportedly *did* "have a defense" (*see id.*) – Niger still chose to sit on its hands for almost six months, finally bringing a motion only on the eve of auction.

Allowing a stay in these circumstances would signal that a litigant can safely ignore a court and respond only when it is on the verge of losing its property, clouding the certainty our judicial system places on judgments, and incentivizing abuse of the adversary process by encouraging defendants to game the system. No public policy would be served by rewarding with equitable relief parties who have "chosen default as their litigation strategy," *Baker*, 810 F. Supp. 2d at 95, by protecting them from the consequences of their deliberate actions.[6]

## III.   THE ILLO DECLARATION AND ITS EXHIBITS SHOULD BE STRUCK FROM THE RECORD

The declaration of Issoufou Illo, and the exhibits thereto, should be struck from the record. Courts routinely strike declarations and affidavits that are "not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) (striking portions of affidavit that was "riddled with inadmissible hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge," and "more

---

[6]   Africard does not argue that the issuance of a stay will substantially injure other parties interested in the proceeding.

resemble[d] an adversarial memorandum than a *bona fide* affidavit") (alterations in original) (internal citations omitted); *Mugno v. Societe Internationale De Telecommunications Aeronautiques, Ltd.*, 2007 WL 316573, at *9, n. 9 (E.D.N.Y. Jan. 30, 2007) (striking declaration that was not based on personal knowledge and stating that declarations "replete with conclusory allegations and legal arguments . . . presented in the form of rhetorical questions" should be struck); *Hinkson v. Bank of Am.*, 2012 WL 12878684, at *3 (S.D. Cal. Nov. 13, 2012) (striking portions of declarations not based on declarant's personal knowledge); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 1994 WL 18588, at *1 (D.D.C. Jan. 10, 1994) (striking exhibits that proffering party failed to properly authenticate).

Moreover, the court can properly exercise its discretion to strike in the context of a motion for injunctive relief.  *Hinkson*, 2012 WL 12878684, at *3 (granting motion to strike in connection with motion for preliminary injunction).

As discussed above, the exhibits to the Illo Declaration are inadmissible (with the possible exception of Exhibit 1 thereto), as Mr. Illo has produced no indication that those documents are what they purport to be under Rule 901(b)(1) of the Federal Rules of Evidence. The Illo declaration itself is also inadmissible, as it contains argument and hearsay, not testimony concerning evidence within Mr. Illo's personal knowledge, as required by Rule 602.  The Illo Declaration and the exhibits thereto should therefore be stricken from the record.

## IV.   ANY ORDER FOR A STAY SHOULD ALSO REQUIRE THAT NIGER POST A BOND AS SECURITY TO AFRICARD

In the event this Court exercises its discretion by staying the sale of the property, Africard requests that the Court order Niger to provide a bond sufficient to cover the value of Africard's judgment.  *See* Fed R. Civ. P. 62(b) (the Court has the authority to stay execution of judgment "[o]n appropriate terms for the opposing party's security").  Although Niger asserts that it "offers

appropriate terms for Africard's security insofar as it does not seek to lift the restraint on the Property," (DE 32-1 at 25), Africard can realize the value of its lien only if the property is sold at auction where, as Niger concedes, it will not command an amount sufficient to cover the full value of Africard's judgment. (*Id*. at 25 ("[T]he auction sale set for June 27, 2017 of Niger's NY Property would result in a significantly lower sales price than an unrestrained market sale.") (citing DE 32-23 ¶¶4-5)).  Niger's exhibits also include broker Douglas Elliman Real Estate's listing for the property, which notes that it "will sell at a very deep discount to market value," (DE 32-26), as well as a "New York Post" article quoting the current tenant of the property, Aby Rosen, who states, "I hope to buy it at a low price, which is great for me. I still have a 15-year lease on the property so it is not going to be so attractive to other buyers [at the auction]."  (DE 32-26).  Accordingly, although the property has been valued by Douglas Elliman Real Estate at $47 million, the starting bid at auction will be $15 million.  (DE 32-26.)

In light of that, Niger should be required to provide a bond for the full value of Africard's judgment of $42,442,970.46 (or at least the difference between that full value and the likely sale price of the property at auction, which the Court should assume will be no more than $30 million, for a total bond of $12,442,970.40).  *See United States v. Melot*, 2012 WL 2914224, at *4 (D.N.M. May 23, 2012) (judgment debtors required to provide partial bond where liens on real and personal property were "not sufficient to satisfy the entire judgment").

## CONCLUSION

For the reasons stated above, Niger's Emergency Motion for a stay and its Motion for vacatur and dismissal should be denied.

26

Dated:  June 9, 2017

/s/ Christopher D. Man

| | |
|---|---|
| Christopher D. Man | Thomas J. McCormack |
| CHADBOURNE & PARKE LLP | John P. Figura |
| 1200 New Hampshire Ave., NW | Jacob Laksin |
| Washington, DC  22306 | CHADBOURNE & PARKE LLP |
| (202) 942-6479 | New York, NY 10019 |
| cman@chadbourne.com | (212) 408-5100 |
| | tmccormack@chadbourne.com |
| | jfigura@chadbourne.com |
| | jlaksin@chadbourne.com |

*Attorneys for Africard Co. Ltd.*

*Attorneys for Petitioner-Judgment Creditor*

27